IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| SCOTT D. MCCLURG; TRACY L. MCCARTY; DECEDENT LARRY CRUM, THROUGH HIS HEIRS TRACY L. MCCARTY, RON CRUM, JODI MEYER, AND DEANNA LUSS, AND TRACY L. MCCARTY AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF LARRY CRUM; STACY BLODGETT; TALAYNA MARCO; HOLLY COIL; GAIL MOORE; WILLIAM N. CRUMP; ANTONIO MEGLIO; CHRISTOPHER CAMERON; DECEDENT PATRICIA A. DEUBEL, THROUGH HER HEIRS MARY SHANNON, DANIEL DEUBEL, KATHLEEN URBANOWICZ, AND CAROL M'SHEEHY, AND MARY SHANNON AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF PATRICIA A. DEUBEL; WALTER P. SIECKMANN, SR.; AND WILLIAM B. DONALDSON, | **JURY TRIAL DEMANDED** |
| | CIVIL ACTION No. 4:12-CV-361 |
| _Plaintiffs,_ | **COMPLAINT** |
| v. | **EASTERN DIVISION** |
| MI HOLDINGS, INC. individually and as Successor-in-interest to Mallinckrodt, Inc.; MALLINCKRODT, INC. a Delaware Corp., individually and as Successor-in-interest to Mallinckrodt Inc., a Missouri Corp.; ASSOCIATES FIRST CAPITAL CORP., individually and as Successor-in-interest to Contemporary Metals Corp.; Continental Mining & Milling Co.; and Commercial Discount Corp.; CITIGROUP, INC., individually and as Successor-in-interest to The Associates Corporation; COTTER CORP.; COMMONWEALTH EDISON CO.; P&H CONSTRUCTION Co. individually and as Successor-in-interest to B&K Construction Company; JARBOE REALTY AND INVESTMENT COMPANY, INC.; DJR HOLDINGS, INC. individually and as Successor-in-interest to Futura Coatings, Inc.; THE DOW CHEMICAL CO.; COVIDIEN, INC.; EXELON CORP.; EXELON GENERATION CO., LLC; ROCK ROAD INDUSTRIES, INC.; and BRIDGETON LANDFILL, LLC, | |
| _Defendants._ | |

## I.

## INTRODUCTION

1.  Plaintiffs bring this action against Defendants seeking redress for injuries suffered as a result of Defendants' reckless, negligent and grossly negligent operations, including but not limited to the processing, transport, storage, handling, and/or disposal of hazardous, toxic and radioactive materials in close proximity to residential neighborhoods in and around St. Louis, Missouri.

2.  Defendants' reckless, negligent and grossly negligent conduct caused the release of hazardous, toxic and radioactive substances into the environment, thereby contaminating the air, soil, surface water and ground water in the surrounding communities.  The harm directly and proximately caused by Defendants' reckless, negligent and grossly negligent conduct includes personal injury and emotional distress.

## II.

## JURISDICTION

3.  This action arises under the United States Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*, and the United States Price-Anderson Act, 42 U.S.C. § 2210 *et seq.*, as hereinafter more fully appears. Therefore, this Court has jurisdiction over Plaintiffs' claims by virtue of 28 U.S.C. § 1331.

4.  Additionally, Section 2210(n)(2) of the Price-Anderson Act provides an express grant of jurisdiction to the United States District Courts.

5.  Because this action also arises under laws of the United States regulating commerce, this Court has jurisdiction over Plaintiff's claims by virtue of 28 U.S.C. § 1337, as hereinafter more fully appears. The Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*, and the Price-Anderson Act, 42 U.S.C. § 2210 *et seq.*, both regulate commerce in the nuclear fuels and nuclear power industry.

6. Because Plaintiffs' state law claims arise out of the same case or controversy as their federal claims, this Court has jurisdiction over those ancillary and pendent state law claims by virtue of 28 U.S.C. § 1367(a).

### III.
### VENUE

7. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiffs' causes of action arose in this district, and because pursuant to 42 U.S.C. § 2210(n)(2), the nuclear incidents giving rise to Plaintiffs' claim took place in this district.

8. Additionally, venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1), because Defendants reside in different districts of Illinois, Missouri and Colorado and, thus, venue can be laid where any Defendant resides. A corporation resides, pursuant to 28 U.S.C. § 1391(c), anywhere it is subject to personal jurisdiction.

9. Furthermore, pursuant to E.D.Mo. L.R. 3-2.07(B)(2), venue may be brought "in the division where the claim for relief arose," which is St. Louis County, Missouri.

10. Here, Plaintiffs were first injured in St. Louis County, Missouri. Pursuant to Mo. Rev. Stat. § 508.010 (4) (2011), venue is proper if brought in the "county where the plaintiff was first injured by the wrongful acts or negligent conduct alleged in the action."

### IV.
### THE PARTIES

11. The following persons are the Plaintiffs in this action:

A.1. Scott D. McClurg currently resides in Carbondale, Illinois. Scott D. McClurg lived at 1635 Koch Drive, Florissant, Missouri, for approximately twenty (20) years, from his birth in 1972 to 1990. He attended elementary, middle, and high schools in the area and visited friends and relatives in Florissant his entire life. Mr. McClurg frequented baseball fields and engaged in

outdoor recreational activities in close proximity to Coldwater Creek.   Mr. McClurg also maintained a vegetable garden at his Florissant residence, and regularly consumed produce harvested from his garden.  Subsequently, Mr. McClurg was diagnosed with Stage III Glioma. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous and radioactive substances into the area surrounding his home, Mr. McClurg has developed significant and debilitating personal injuries.  As a result of Defendants' reckless, negligent, and grossly negligent conduct, Mr. McClurg has suffered and continues to suffer severe physical injury, pain, suffering, and mental and emotional damage and distress.

A.2.     Tracy L. McCarty currently resides in O'Fallon, Missouri.  Tracy L. McCarty lived at 141 Elm Grove, Hazelwood, Missouri, for approximately twenty-one (21) years. Ms. McCarty lived near Coldwater Creek and engaged in numerous outdoor activities in the playgrounds and fields adjacent to Coldwater Creek throughout her childhood.  Subsequently, Ms. McCarty was diagnosed with ovarian cancer and ovarian tumors. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous and radioactive substances into the area surrounding her home, Ms. McCarty has developed significant and debilitating personal injuries.  As a result of Defendants' reckless, negligent, and grossly negligent conduct, Ms. McCarty has suffered and continues to suffer severe physical injury, pain, suffering, and mental and emotional damage and distress.

A.3.     Tracy L. McCarty, Ron Crum, Jodi Meyer, and Deanna Luss are the heirs of decedent Larry Crum, and Tracy L. McCarty is the Personal Representative for the Estate of Larry Crum. Larry Crum passed away on May 11, 2011, as a result of throat and neck cancer.  Larry Crum lived at 141 Elm Grove, Hazelwood, Missouri, for approximately forty-four (44) years. Mr.

Crum lived near Coldwater Creek, did extensive yard work while living at this address, and engaged in numerous outdoor activities near Coldwater Creek with his children.  Subsequently, Mr. Crum was diagnosed with cancer of the throat and neck. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous and radioactive substances into the area surrounding his home, Mr. Crum developed significant and debilitating personal injuries.  As a result of Defendants' reckless, negligent, and grossly negligent conduct, Mr. Crum suffered severe physical injury, pain, suffering, and mental and emotional damage and distress.

A.4.    Stacy Blodgett currently resides in St. Ann, Missouri.  Stacey Blodgett often visited her grandmother, who lived at 30 Calbreath Court, Florissant, Missouri. Throughout her childhood, Ms. Blodgett engaged in numerous outdoor activities in the playgrounds and fields adjacent to Coldwater Creek.  Subsequently, Ms. Blodgett was diagnosed with Hodgkins Lymphoma. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous and radioactive substances into the area surrounding her grandmother's home, Ms. Blodgett has developed significant and debilitating personal injuries. As a result of Defendants' reckless, negligent, and grossly negligent conduct, Ms. Blodgett has suffered and continues to suffer severe physical injury, pain, suffering, and mental and emotional damage and distress.

A.5.    Talayna Marco currently resides in Wildwood, Missouri.  Talayna Marco lived at 13 Louise Court, Florissant, Missouri, for approximately ten (10) years and at 2345 Belfast Drive, Florissant, Missouri, for approximately thirteen (13) years.  Coldwater Creek ran through Ms. Marco's backyard on 13 Louise Court.  Ms. Marco engaged in numerous outdoor activities in and near Coldwater Creek throughout her childhood, including playing in the creek and at the

adjacent playgrounds and fields. Subsequently, Ms. Marco was diagnosed with cervical cancer and required a hysterectomy. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous and radioactive substances into the area surrounding her homes, Ms. Marco has developed significant and debilitating personal injuries. As a result of Defendants' reckless, negligent, and grossly negligent conduct, Ms. Marco has suffered and continues to suffer severe physical injury, pain, suffering, and mental and emotional damage and distress.

A.6.    Holly Coil currently resides in Florissant, Missouri. For approximately thirty-eight (38) years, Holly Coil lived at various addresses in Florissant, Missouri, including 60 Taney Drive, 1950 Trotter Way, 1479 St. Catherine Street, on St. George Court, and in the Spring Creek Condominiums. She attended elementary, middle, and high schools in the area and visited friends and relatives in Florissant her entire life. Ms. Coil engaged in numerous outdoor activities, including yard work at her parents' homes, near Coldwater Creek throughout her childhood. Subsequently, Ms. Coil was diagnosed with ovarian cancer at the age of eighteen (18). As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous and radioactive substances into the area surrounding her homes, Ms. Coil has developed significant and debilitating personal injuries. As a result of Defendants' reckless, negligent, and grossly negligent conduct, Ms. Coil has suffered and continues to suffer severe physical injury, pain, suffering, and mental and emotional damage and distress.

A.7.    Gail Moore currently resides in Fenton, Missouri. Gail Moore lived at 6945 and 6925 Berkridge Court, Hazelwood, Missouri, for approximately eight (8) years between 1957 and 1965. Ms. Moore engaged in numerous outdoor activities in and near Coldwater Creek and the

Latty Avenue site throughout her childhood.  Subsequently, Ms. Moore was diagnosed with breast cancer. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous and radioactive substances into the area surrounding her homes, Ms. Moore has developed significant and debilitating personal injuries. As a result of Defendants' reckless, negligent, and grossly negligent conduct, Ms. Moore has suffered and continues to suffer severe physical injury, pain, suffering, and mental and emotional damage and distress.

A.8.    William N. Crump currently resides in St. Peters, Missouri.  William N. Crump lived in Florissant, Missouri, for approximately eight (8) years, on Lexington Park and at 2430 North Pointe Lane. He attended elementary, middle, and high schools in the area.  Mr. Crump engaged in numerous outdoor activities in and near Coldwater Creek throughout his childhood, including playing in and catching crawdads and tadpoles in the in the creek.   Subsequently, Mr. Crump was diagnosed with Squamous Cell Carcinoma of the throat.   As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous and radioactive substances into the area surrounding his homes, Mr. Crump has developed significant and debilitating personal injuries.   As a result of Defendants' reckless, negligent, and grossly negligent conduct, Mr. Crump has suffered and continues to suffer severe physical injury, pain, suffering, and mental and emotional damage and distress.

A.9.    Antonio Meglio currently resides in Creve Coeur, Missouri.  Antonio Meglio lived at 254 Palm Drive, Hazelwood, Missouri, for approximately twenty-three (23) years.   While living at this address, water from Coldwater Creek flooded in to Mr. Meglio's finished basement. Subsequently, Mr. Meglio was diagnosed with cancer of the kidney and prostate.  As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or

disposing of hazardous and radioactive substances into the area surrounding his home, Mr. Meglio has developed significant and debilitating personal injuries.  As a result of Defendants' reckless, negligent, and grossly negligent conduct, Mr. Meglio has suffered and continues to suffer severe physical injury, pain, suffering, and mental and emotional damage and distress.

A.10.   Christopher Cameron currently resides in Florissant, Missouri.  Christopher Cameron lived at 513 Coachway Lane, Hazelwood, Missouri, for approximately twenty-six (26) years.  He attended elementary, middle, and high schools in the area.  Mr. Cameron frequented baseball fields and engaged in outdoor recreational activities in close proximity to Coldwater Creek. Subsequently, Mr. Cameron was diagnosed with Ewing Sarcoma when he was seventeen (17) years old and is now sterile.   As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous and radioactive substances into the area surrounding his home, Mr. Cameron has developed significant and debilitating personal injuries.   As a result of Defendants' reckless, negligent, and grossly negligent conduct, Mr. Cameron has suffered and continues to suffer severe physical injury, pain, suffering, and mental and emotional damage and distress.

A.11.   Mary Shannon, Daniel Deubel, Kathleen Urbanowicz, and Carol M'Sheehy are the heirs of decedent Patricia A. Deubel, and Mary Shannon is the Personal Representative for the Estate of Patricia A. Deubel.  Patricia A. Deubel passed away on February 28, 2009, as a result of pancreatic cancer.  Patricia A. Deubel lived at 246 Palm Drive, Hazelwood, Missouri, for approximately forty-eight (48) years. While living at this address, water from Coldwater Creek flooded in to Ms. Deubel's basement on numerous occassions.  Subsequently, Ms. Deubel was diagnosed with pancreatic cancer. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous and radioactive

substances into the area surrounding her home, Ms. Deubel developed significant and debilitating personal injuries.  As a result of Defendants' reckless, negligent, and grossly negligent conduct, Ms. Deubel suffered severe physical injury, pain, suffering, and mental and emotional damage and distress.

A.12.  Walter P. Sieckmann, Sr. currently resides in Black Jack, Missouri.   Walter P. Sieckmann, Sr., lived at #2 Otterburn Court, Florissant, Missouri, for approximately thirteen (13) years.  He attended elementary, middle, and high schools in the area.  Mr. Sieckmann frequented baseball fields and engaged in outdoor recreational activities in close proximity to Coldwater Creek.  Subsequently, Mr. Sieckmann was diagnosed with a Gastrointestinal Stromal Tumor.  As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous and radioactive substances into the area surrounding his home, Mr. Sieckmann has developed significant and debilitating personal injuries.  As a result of Defendants' reckless, negligent, and grossly negligent conduct, Mr. Sieckmann has suffered and continues to suffer severe physical injury, pain, suffering, and mental and emotional damage and distress.

A.13.   William B. Donaldson currently resides in St. Ann, Missouri.  William B. Donaldson has lived at 3907 Fairway Court, St. Ann, Missouri, for approximately thirty-one (31) years. Coldwater Creek is approximately twenty (20) yards from Mr. Donaldson's home and has, when flooding, come up to his home.  Subsequently, Mr. Donaldson was diagnosed with a lung, colon, and prostate cancers.   As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous and radioactive substances into the area surrounding his home, Mr. Donaldson has developed significant and debilitating personal injuries.  As a result of Defendants' reckless, negligent, and grossly negligent conduct, Mr.

Donaldson has suffered and continues to suffer severe physical injury, pain, suffering, and mental and emotional damage and distress.

12. The following entities are Defendants in this action:

B.1.    MI Holdings, Inc., individually and as successor-in-interest to Mallinckrodt, Inc., a former Missouri corporation ("Mallinckrodt Missouri"), is a Missouri corporation with its principal place of business in Bronxville, New York.  Upon information and belief, Mallinckrodt Chemical Works is now known as or has been merged into MI Holdings and Mallinckrodt, Inc.

B.2.    Mallinckrodt, Inc., individually and as successor-in-interest to Mallinckrodt Missouri, is a Delaware corporation with its principal place of business in Mansfield, Massachusetts.  Upon information and belief, in 1986, Mallinckrodt Missouri was broken up and sold to MI Holdings, Inc. and Mallinckrodt, Inc.  Upon information and belief, Mallinckrodt Chemical Works is now known as or has been merged into MI Holdings and Mallinckrodt, Inc.  Mallinckrodt Nuclear Corporation was formerly a wholly owned subsidiary of Mallinckrodt Chemical Works. Mallinckrodt Chemical Works and Mallinckrodt Nuclear Corporation will be referred to collectively as "Mallinckrodt."

B.3.    Associates First Capital Corporation ("AFC"), individually and as Successor-in-interest to Contemporary Metals Corp. ("Contemporary Metals"),[1] Continental Mining & Milling Co. ("CMMC"),[2] and Commercial Discount Corp. ("CDC"),[3] is a Delaware corporation authorized,

_____

[1] Contemporary Metals Corporation ("Contemporary Metals") was a California corporation that conducted business in Hazelwood, Missouri.  Contemporary Metals' current status with the California Department of State is "suspended."   Upon information and belief, at all times relevant to this action, Contemporary Metals, itself or through its agents, which include but are not limited to Continental Mining & Milling Co., removed uranium-bearing residues from stockpiled areas at the St. Louis facilities to its Hazelwood facility in order to extract the associated minerals and other recoverable by-products for resale.  It was estimated that, from 1962 through 1966, Contemporary Metals removed approximately 125,000 tons of radioactive residues from the St. Louis facilities to its Hazelwood facility.

[2] Continental Mining & Milling Co. ("CMMC") was a Delaware corporation that conducted business in Hazelwood, Missouri.  CMMC's status with the Missouri Department of State is "forfeited."  Upon information and

at all times relevant to this litigation, to do business in Illinois.  AFC acquired CDC in 1975.  The merger between AFC and CDC resulted in formation of The Associates Corporation.

B.4.    Citigroup, Inc., individually and as successor-in-interest to The Associates Corporation, is a Delaware Corporation with its principal place of business in New York, New York. Citigroup, Inc. is a national corporation and an internationally recognized brand. In 2000, Citigroup, Inc. acquired The Associates Corporation.

B.5.    Cotter Corporation ("Cotter"), a New Mexico corporation with its principal place of business in Englewood, Colorado, operates as a subsidiary of General Atomics, Inc., a California corporation.  It was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1975.   Through its various mining and milling operations, Cotter has produced uranium, vanadium, molybdenum, silver, lead, zinc, copper, selenium, nickel, cobalt, tungsten and limestone.   In December 1969, Cotter purchased the remaining residues at 9200 Latty Avenue and dried and shipped those residues to Colorado at a rate of approximately 400 tons per day.  B&K Construction Company was engaged by Cotter for this purpose.

B.6.    Commonwealth Edison Company ("ComEd") is an Illinois corporation whose subsidiary corporation, Cotter, did business at 9200 Latty Avenue and at the West Lake Landfill in Bridgeton, Missouri.   Upon sale of Cotter, ComEd agreed to indemnify Cotter for any liability incurred by Cotter in connection with the West Lake Landfill.

---

belief, CMMC removed uranium-bearing residues from stockpiled areas at the St. Louis Downtown Site and transported the same to the Hazelwood Interim Storage Site in order to extract the associated minerals and other recoverable by-products for resale.   In 1966, CMMC was authorized to possess 125,000 tons of uranium and thorium, a portion of which was moved to its proposed processing site at 9200 Latty Avenue.   CMMC went into receivership in 1966.

[3] Commercial Discount Corporation ("CDC") was a Delaware corporation with its principal place of business in Irving, Texas that conducted business in Hazelwood, Missouri.  Upon information and belief, CDC took control of CMMC's assets, including 9200 Latty Avenue.  CDC was registered with the Illinois Department of State, and had a registered agent to accept service of process on its behalf residing in Chicago, Illinois.  Upon information and belief, between 1966 and 1969 CDC stored and dried uranium and thorium source material before shipping it to Cotter Corporation.

B.7.    P&H Construction Co., as successor-in-interest to B&K Construction Company, is an Illinois corporation.  B&K was hired by Cotter to dry and ship residues from Latty Avenue to Cotter's Colorado mill.  Upon information and belief, approximately 400 tons per day were shipped.  Soil from the Latty Avenue site containing uranium oxide and leached barium residues had been disposed of at the West Lake Landfill.

B.8.    Jarboe Realty and Investment Co., Inc. ("Jarboe") is a Missouri corporation, conducting business in Hazelwood, Missouri.  The company was, at all times relevant to this action, owned and/or operated by Dean Jarboe.  Upon information and belief, Mr. Jarboe purchased the Latty Avenue site in June 1977.

B.9.    DJR Holdings, Inc., formerly known as "Futura Coatings, Inc.," is a Missouri corporation conducting business in Hazelwood, Missouri.

B.10.   The Dow Chemical Company ("Dow") is a Delaware corporation conducting business in Madison, Illinois.  Dow, itself or through its agents, which include but are not limited to Dow Chemical Company and Dow Metal Products, operated a uranium extrusion and rod-straightening facility at the Madison Site.

B.11.   Covidien, Inc. ("Covidien"), formerly known as "SWD Holding, Inc.," is a Delaware corporation with its principal place of business in Massachusetts.  Covidien, itself or through its agents, conducted business in Hazelwood, Missouri.

B.12.   Exelon Corporation ("Exelon"), the parent company of ComEd, is a Pennsylvania corporation with its principal place of business in Chicago, Illinois.  Exelon, by and through its agents, which include but are not limited to ComEd and Cotter, disposed of radioactive wastes at West Lake Landfill.

B.13.  Exelon Generation Company, LLC ("EGC") is a Pennsylvania corporation with its principal place of business in Kennett Square, Pennsylvania.  In connection with Exelon's corporate restructuring in 2001, the responsibility to indemnify Cotter, previously held by Exelon, was transferred to EGC.

B.14.  Rock Road Industries is a Missouri corporation with its principal place of business in St. Louis, Missouri.  Upon information and belief, Rock Road Industries, with Bridgeton Landfill, currently owns West Lake Landfill and is identified by the EPA as a potentially responsible party.

B.15.  Bridgeton Landfill, LLC, formerly "Laidlaw Waste Systems," is a Delaware corporation authorized to do business in Missouri.  Upon information and belief, Bridgeton Landfill, with Rock Road Industries, currently owns West Lake Landfill and is identified by the EPA as a potentially responsible party.

## V.
## RELEVANT FACTS

13. At all times material hereto, Defendants or their predecessors in interest were engaged in the business of processing, distributing, transporting, storing, handling and/or disposing of hazardous, toxic, and radioactive materials at facilities located in and around St. Louis, Missouri. The nuclear processing facilities, and the hazardous, toxic and radioactive waste residues they generated, were at all times material hereto owned, operated or under the exclusive control of Defendants or their agents.

14. Plaintiffs allege that, as a direct result of Defendants' reckless, negligent and grossly negligent conduct, they were  exposed to hazardous, toxic, and radioactive substances that were released by Defendants into the environment, including the air, water, and soil, in and around their residences in north St. Louis County, Missouri.  Plaintiffs further allege that, as a direct

result of Defendants' reckless, negligent and grossly negligent conduct, they have inhaled, ingested or otherwise absorbed such hazardous, toxic, and radioactive substances into their bodies, and that their exposure to these substances directly and proximately caused his injuries.

15. Plaintiffs allege that, as a direct result of Defendants' reckless, negligent and grossly negligent conduct, they were directly exposed to hazardous, toxic and radioactive substances known to cause disease, and that this exposure caused or contributed to Plaintiffs' injuries. Therefore, the doctrine of joint and several liability should be extended to apply to each Defendant herein.

## **BACKGROUND**

16. During World War II, the nation began a top-secret project to build the first atomic bomb. At this time, the Army created the Manhattan Engineering District ("MED") to carry out much of the work of the so-called "Manhattan Project."  After the war, the nation sought ways to use nuclear energy for peaceful purposes and formed the Atomic Energy Commission ("AEC") in 1946 to continue this nuclear research.  Some of this work was performed in the St. Louis area.

17. From 1942 to 1957, under contracts with the MED and/or the AEC, the Destrehan Street Refinery and Metal Plant (which later became Mallinckrodt Chemical Works) processed natural uranium into uranium oxide, trioxide and metal uranium at a facility in downtown St. Louis, Missouri.  This facility became known as the St. Louis Downtown Site ("SLDS").  The SLDS site became contaminated with hazardous, toxic and radioactive substances as a result.

18. In 1946, MED acquired the St. Louis Airport Site ("SLAPS"), a 21-acre site just north of the St. Louis Airport, for storage of hazardous, toxic and radioactive waste residues from the SLDS.  In subsequent years, the SLAPS and adjacent properties became contaminated with hazardous, toxic and radioactive substances as a result.

14

19. During the 1960's, private companies purchased the hazardous, toxic and radioactive waste residues being stored at the SLAPS and began hauling them from the SLAPS to a site on Latty Avenue in Berkeley, Missouri (part of this site later became the Hazelwood Interim Storage Site ("HISS")).  These waste residues, which contained valuable metals, were sold for their commercial value and shipped to various other destinations.  The Latty Avenue site became contaminated with hazardous, toxic and radioactive substances as a result.

20. Transport and migration of hazardous, toxic and radioactive waste residues to/from the SLDS, the SLAPS and the HISS also spread hazardous, toxic and radioactive substances along haul routes to nearby Vicinity Properties ("VPs").  Even though the federal government was not responsible for this contamination, Congress directed that the government add these sites to the Formerly Utilized Sites Remedial Action Program ("FUSRAP").[4]

### THE ST. LOUIS FUSRAP SITES [5]

21. Between 1942 and 1973, Defendants processed, stored, handled, and/or disposed of large volumes of hazardous, toxic and radioactive materials in four separate geographical areas located in and around metropolitan St. Louis, Missouri.  The designations assigned to these sites are the St. Louis Downtown Site, the North St. Louis County Sites, the Madison Site, and the West Lake Landfill Site.

### The St. Louis Downtown Site ("SLDS"):

22. The St. Louis Downtown Site is located in an industrial area on the eastern border of St. Louis, approximately 300 feet west of the Mississippi River.  The property is about 11 miles

---

[4] The Formerly Utilized Sites Remedial Action Program (FUSRAP) is an environmental remediation program that addresses radiological contamination generated by activities of the Manhattan Engineer District and the Atomic Energy Commission ("MED/AEC") during development of the atomic weapons in the 1940s and 50s.

[5] The St. Louis FUSRAP Sites include: (1) the St. Louis Downtown Site ("SLDS"); (2) the St. Louis Airport Site ("SLAPS"); (3) the Hazelwood Interim Storage Site ("HISS"); (4) the Vicinity Properties ("VPs"); and (5) the Madison Site.

southeast of the SLAPS and the Lambert-St. Louis International Airport. The SLDS encompasses nearly 45 acres and is presently owned and operated by Mallinckrodt, Inc. (formerly Mallinckrodt Chemical Works). The property includes many buildings and other facilities involved in chemical production.

23. From 1942 to 1957, the SLDS was used for processing various forms of uranium compounds, for machining and for recovery of uranium metal. In 1946, the manufacture of uranium dioxide from pitchblende ore began at a newly constructed plant at the SLDS. The pitchblende ore was acquired from the African Metals Company. Because the African Metals Company retained ownership of the radium content of the ore, it was required that radium-226 and its daughter products be extracted along with the lead content. The radium and lead were precipitated, and the precipitate was stored, handled and transported to out of state facilities.

24. When the SLDS ran out of space to store the hazardous, toxic and radioactive waste residues left over from the production process, a 21.7-acre tract of land (now known as the SLAPS) was procured in north St. Louis County to store hazardous, toxic and radioactive waste residues from uranium processing at the SLDS.

**The North St. Louis County Sites:**[6]

25. The St. Louis Airport Site is an unincorporated 21.7-acre property located near the St. Louis Airport in north St. Louis County. The SLAPS is bounded by McDonnell Boulevard to the north, Banshee Road and Norfolk Southern Railroad on the south, and Coldwater Creek on the west.

---

[6] The North St. Louis County Sites consist of: (1) the St. Louis Airport Site; (2) the SLAPS Vicinity Properties (VPs); and (3) the Latty Avenue Properties. In October 1989, EPA placed three of the North St. Louis County site properties (SLAPS, HISS, and Futura Coatings Company) on the Superfund National Priorities List ("NPL").

26. The SLAPS was used primarily to store hazardous, toxic and radioactive waste residues from uranium processing activities that took place at the SLDS.  These materials included, but were not limited to, pitchblende raffinate residues, radium-bearing residues, barium sulfate cake, Colorado raffinate residues and contaminated scrap.  Radioactive waste materials at the SLAPS were recklessly stored in bulk on the open ground, or buried at the western end (near Coldwater Creek) and at other parts of the property.  By 1960, there were approximately 50,000 empty drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS.

27. The SLAPS Vicinity Properties ("VPs") consist of approximately 78 properties, including properties along former haul routes between the SLAPS and the HISS, Coldwater Creek, the open fields (a former ball field area) immediately north of the SLAPS, and other SLAPS contiguous properties.  The SLAPS VPs impacted by hazardous, toxic, and radioactive wastes are located along the haul routes between the SLAPS and the HISS, and include both recreational and residential properties.  These haul routes include Eva Avenue, Frost Avenue, Hazelwood Avenue, McDonnell Boulevard, and Pershall Road.

28. Coldwater Creek flows for 500 feet [153 meters] along the western border of the SLAPS. The creek originates 3.6 miles [5.8 kilometers] to the south of the SLAPS and continues for 15 miles [24 kilometers] in a northeasterly direction through the City of Hazelwood, the City of Florissant, unincorporated areas of St. Louis County, and along the northern edge of the community of Black Jack, until it discharges into the Missouri River.  Coldwater Creek is generally accessible to the public, except for approximately 1.2 miles [1.9 kilometers], which flows under the Lambert-St. Louis International Airport.  Coldwater Creek is contaminated with hazardous, toxic, and radioactive materials.

29. The Latty Avenue Properties are located in an area approximately one half mile [1 kilometer] north of the St. Louis Airport in the towns of Hazelwood and Berkeley, Missouri. The Properties include: (1) the Hazelwood Interim Storage Site; (2) the Futura Coatings Site (used for manufacturing plastic coatings); and (3) several Vicinity Properties on Latty Avenue. The Latty Avenue Properties have elevated levels of residual uranium and thorium on site.

30. From approximately 1961 to 1990, hazardous, toxic, and radioactive materials, specifically those involved in the processing of columbium and tantalum (C-T), were used in activities for commercial clients at the SLDS.  The contamination present in the soil and groundwater at the FUSRAP sites may be attributed to releases of radionuclides to the environment during the uranium processing operations, the C-T processing operations, or operations unique to the VPs.

31. Hundreds of thousands of tons of hazardous, toxic, and radioactive wastes were transported from the SLDS to the SLAPS for storage, including radium-bearing residues, refined cake, barium sulfate cake, and C-liner slag.  Over time, these hazardous, toxic, and radioactive waste residues migrated directly from the SLAPS onto other sites (via Coldwater Creek) or were deposited as the residues were hauled along transportation routes, contaminating the soils and sediments of the Vicinity Properties.

32. The SLDS and the North St. Louis County Sites have elevated levels of uranium, thorium, and radium in soils and groundwater.  The EPA has concluded that direct contact with, or accidental ingestion of, contaminated soils or groundwater near these sites may pose health risks to individuals.

**The Madison Site:**

33. The Madison Site is located across the Mississippi River from the SLDS at College and Weaver Streets in Madison, Illinois.  The Madison Site was part of an operating facility formerly owned or operated by Dow Chemical Company, a division of Dow Metal Products.

34. Dow Chemical Company worked with Mallinckrodt, Inc. during the late 1950s and early 1960s to operate a uranium extrusion and rod-straightening facility at the Madison Site.  Since that time, the Madison Site has been contaminated with hazardous, toxic, and radioactive materials.

**The West Lake Landfill:**

35. The West Lake Landfill Site is located on a 200-acre parcel at 13570 St. Charles Rock Road in Bridgeton, Missouri, approximately four miles west of the SLAPS, and just 17 miles from downtown St. Louis.  The West Lake Landfill is the disposal site for thousands of tons of radioactive wastes received from the SLAPS.  The southeastern portion of the Site contains radioactively contaminated soils buried at depths ranging from 7 feet to 15 feet, covering about 5 acres, and the northern portion of the Site contains radioactive material at depths up to 12 feet, with some localized deeper intervals, covering about 19 acres.  The West Lake Landfill has been contaminated with hazardous, toxic, and radioactive wastes.

36. The West Lake Landfill is upstream from the intake sources for the Missouri American Water Company, which supplies drinking water to Florissant and North County, and the Chain of Rocks, which supplies drinking water to the city of St. Louis.  Furthermore, the West Lake Landfill lies partially within the Missouri River geomorphic flood plain in northwest St. Louis County.

37. Groundwater beneath the West Lake Landfill is shallow, and monitoring wells showed radionuclide concentrations above the Maximum Contaminant Levels ("MCL").  The West Lake

Landfill poses a potential threat to on-site users from external gamma radiation and radon gas emissions and was placed on the U.S. Environmental Protection Agency's National Priorities List ("NPL") on October 26, 1989.

38. Based on available information, a potential health threat exists from the hazardous, toxic, and radioactive wastes at the site.  Furthermore, the potential for future exposure exists based on both direct contact with the waste materials and the possibility that off-site migration will continue to occur.

## VI.

## SITE HISTORY

39. Mallinckrodt, Inc. (formerly Mallinckrodt Chemical Works) processed uranium feed material for the production of uranium metal from 1942 to 1957 under contracts with the Manhattan Engineer District and the Atomic Energy Commission ("MED" / "AEC").  The work was performed at the Mallinckrodt Plant, located at the SLDS.  Within a year, the SLDS ran out of space to store the hazardous, toxic, and radioactive waste residues left over from the production process.

40. Beginning in 1946, the hazardous, toxic, and radioactive waste residues left over from the production process at the SLDS were being transported to the SLAPS for storage.[7]  Scrap metal, chemical drums, and other contaminated debris were placed in low areas at the SLAPS adjacent to Coldwater Creek on the western end of the property and covered with dirt to make a level storage area.

---

[7] The following byproducts and scrap were transported mainly from the SLDS to the SLAPS for storage: padium-bearing residues ("K-65" residues); AM-7 pitchblende raffinate cake; AM-10 Colorado raffinate cake; AJ-4 barium sulfate cake (unleached) and AJ-4 barium cake (leached); C-liner slag that was created during metal firming operations; C-701 U scalping of magnesium fluoride, Japanese precipitates, Vitro residues from the Vitro Corporation's facility in Canonsburg, PA; and empty drums, contaminated steel and alloy scrap, and building debris.

41. By 1960, there were approximately 50,000 chemical drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS directly adjacent to Coldwater Creek.  Coldwater Creek is the major drainage mechanism for the SLAPS, the SLAPS VPs, and the Latty Avenue Properties.  It has been designated a Metropolitan No-Discharge Stream.  Through time, various meanders in Coldwater Creek were backfilled to support construction, resulting in commingling of the site soils and sediments with hazardous, toxic, and radioactive wastes brought to the SLAPS.

42. These hazardous, toxic, and radioactive wastes residues were removed from the SLAPS in various stages throughout the 1960s.  Initially, the residues were sold to Contemporary Metals Corporation ("Contemporary Metals").   Soon thereafter, their subsidiary, Continental Mining & Milling Company ("CMM"), began transporting the waste residues to property at 9200 Latty Avenue (now known as the HISS and the Futura Coatings Company properties) for storage.

43. After CMM went into receivership, the Commercial Discount Corporation ("CDC") of Chicago, Illinois, took possession of its assets, including the Latty Avenue Property and the hazardous, toxic, and radioactive waste residues stored therein.

44. In 1969, the remaining hazardous, toxic, and radioactive wastes residues at Latty Avenue were sold to the Cotter Corporation ("Cotter") of Canon City, Colorado.  In 1970, Cotter employed the B&K Construction Company of St. Louis, Missouri, to transport these waste residues out of state.  By late 1970, most of the residues had shipped offsite, except for 10,000 tons of Colorado raffinate and 8,700 tons of leached barium sulphate raffinates.

45. In 1973, Cotter disposed of approximately 47,700 tons of soil mixed with uranium ore processing residues, including leached barium sulfate, uranium, and thorium, into the West Lake

Landfill.  This radiologically contaminated soil was routinely used as cover for municipal wastes and other landfill operations.

46. Since 1946, residues have migrated from the SLAPS (via runoff onto adjacent properties and Coldwater Creek or wind) or were released or otherwise deposited when material was transported along haul routes, contaminating the soil and sediments at the SLAPS VPs and the Latty Avenue Properties.

47. During the relocation of waste material, improper handling and transportation from the SLAPS to the Latty Avenue Sites, caused contamination to spread along haul routes.  Improper storage exacerbated the contamination and caused adjacent properties (the SLAPS and the Latty Avenue Vicinity Properties (VPs)) to be contaminated.

## VII.
## INVESTIGATION OF CONTAMINATION

48. In October 1989, Congress added the SLAPS, the HISS and the Futura Site to the U.S. EPA's NPL.

49. In 1992, the Madison Site was added to the FUSRAP list slated for cleanup. Approximately two cubic yards of contaminated uranium and thorium dust were located on overhead surfaces.  Forty cubic yards of contaminated dust and materials had to be sent offsite for disposal.

50. In 1994, the Department of Energy ("DOE") issued a Remedial Investigation ("RI") Report summarizing the results of previous investigations conducted at the North St. Louis County Sites and SLDS.  The RI Report concluded that contamination is present in both surface and subsurface soils at the North St. Louis County Sites.

51. In 1995, DOE issued an RI Addendum Report to summarize the results of an additional investigation conducted to fill the data gaps identified in the RI Report.  The activities associated

with this investigation included, but were not limited to, soil sampling at the SLAPS VPs; sediment sampling in Coldwater Creek; installation of monitoring wells at the SLAPS; vegetation sampling along ditches next to the haul roads; and background soil and ground-water sampling.  The results of the investigation confirmed the presence of widespread radioactive contamination of surface and subsurface soils at the North St. Louis County Sites.

## VIII.
## TOPOGRAPHY AND DRAINAGE OF CONTAMINANTS

52. The North St. Louis County and the SLDS sites are located on a modest upland area south of the Missouri River floodplain.  The upland area surrounds a topographic depression known as the Florissant Basin.

53. Coldwater Creek is the major drainage mechanism for the SLAPS, the SLAPS VPs, and the Latty Avenue Properties.  It has been designated a Metropolitan No-Discharge Stream. Coldwater Creek flows adjacent to the SLAPS and the SLAPS VPs, then meanders near the HISS, the Futura Site and other Latty Avenue Properties and continues to flow through northern St. Louis County until it discharges into the Missouri River.

54. Coldwater Creek floods areas of the North St. Louis County Sites including portions of the SLAPS, the HISS, the Futura Site, and several VPs.  The runoff from precipitation that enters Coldwater Creek in a given unit of time greatly exceeds the predevelopment quantities.  This runoff overloads Coldwater Creek and increases the likelihood of local and area-wide flooding.

55. Upon information and belief, the SLAPS and the Latty Avenue VPs, including impacted areas along Coldwater Creek, were contaminated with radium, thorium and uranium. Investigations have determined that contamination levels at the North St. Louis County Sites exceed federal dose limits.

56. On-site sampling at the SLAPS, the HISS and the Futura Sites found elevated levels of hazardous, toxic, and radioactive materials in the groundwater, soils, and air, in excess of regional isotope background values.

57. Operations at the St. Louis FUSRAP Sites have included, but were not limited to, the processing, storing, handling and/or disposing of uranium, enriched uranium, and other radioactive materials constituting source, special nuclear, or nuclear by-product materials as defined in the Atomic Energy Act, 42 U.S.C. § 2011 *et seq.* These radioactive materials, their by-products, and their decay (or "daughter") products are highly toxic and carcinogenic.

58. Operations at the St. Louis FUSRAP Sites have also involved the use of non-radioactive chemicals, many of which are classified as hazardous under applicable federal law. *See, e.g.,* 42 U.S.C. § 9601(14); 40 C.F.R. § 302.4 [including tables]; 42 U.S.C. § 6903(5); 40 C.F.R. § 261.3; and 40 C.F.R. Part 261, Subpart D.

59. Plaintiffs contend that Defendants' processing, storage, handling and/or disposal of hazardous, toxic, and radioactive materials at the St. Louis FUSRAP Sites have generated significant quantities of substances that are highly toxic to humans and the environment and are carcinogenic.

60. Plaintiffs further contend that throughout the history of St. Louis FUSRAP Sites, each Defendant (or its predecessor in interest) caused recurrent releases of hazardous, toxic, and radioactive materials into the environment, in complete disregard for applicable law and for the health and safety of the surrounding communities and the natural environment. These reckless, negligent and grossly negligent releases occurred in various ways, including through direct and indirect discharges of radioactive and toxic materials into public water bodies, such as Coldwater

24

Creek; the exposure of workers to these materials, who then in turn spread contamination outside the worksite; and the improper disposal of hazardous, toxic, and radioactive materials.

61. These reckless, negligent and grossly negligent releases have resulted in Plaintiffs' exposure to hazardous, toxic, and radioactive materials.  Moreover, because of the long half-life of the radioactive substances involved, persons currently living near the St. Louis FUSRAP Sites have been, and will continue to be, exposed to these dangerous substances.

62. Upon information and belief, the substances to which Plaintiffs and their communities were exposed include, but were not limited to, the natural forms and various isotopes of cesium, thorium, radium, uranium and radon.  Some of these substances were used in the conduct of Defendants' operations, and some were created as by-products or decay ("daughter") products.

## IX.

### CAUSES OF ACTION

### COUNT ONE:  CLAIMS ARISING UNDER THE PRICE-ANDERSON ACT, 42 U.S.C. § 2210 *et seq.*

63. Plaintiffs reallege and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein.

64. Plaintiffs in this case assert numerous state common law claims against Defendants for injuries suffered by Plaintiff.  Because these Defendants are regulated by the terms of the federal Price-Anderson Act, as hereinafter more fully appears, those state law claims are statutorily deemed to arise under the federal Price-Anderson Act, thereby stating a federal cause of action. 42 U.S.C. §§ 2014(hh), 2210.

65. Defendants in this action have, at times material to this action, conducted various activities involving nuclear materials.  These activities include the processing, handling, storing, transporting, and disposing of hazardous, toxic, and radioactive materials.  They are therefore engaged in the development, use and control of atomic energy within the terms of the Atomic

Energy Act, 42 U.S.C. § 2011 *et seq.*  A consequence of these activities is the requirement that Defendants obtain a federal license authorizing their operations involving nuclear materials.  42 U.S.C. §§ 2210, 2073, 2092, 2093, and 2111.  Defendants or their predecessors and/or agents have at all relevant times held such federal licenses.

66. In 1957, Congress amended the Atomic Energy Act to implement its policy to foster private sector participation in the nuclear energy industry.  These 1957 amendments became known as the Price-Anderson Act.  The uranium, thorium, and other radioactive substances processed, handled, stored, and/or disposed by Defendants at the St. Louis FUSRAP Sites include nuclear by-product materials, special nuclear materials, and/or source materials.  42 U.S.C. § 2014(e), (z), (aa).  Any release of these by-product, special nuclear, or source materials causing bodily injury, sickness, disease, death, loss or damage to property, or loss of use of property constitutes a "nuclear incident" under the terms of the Price-Anderson Act.  42 U.S.C. § 2014(q).  Plaintiff in this case contends that Defendants have conducted activities at the St. Louis FUSRAP Sites in a reckless, negligent and grossly negligent fashion, and have, as a consequence, caused the frequent release of by-product, special nuclear, and/or source materials into the surrounding communities, thereby causing a "nuclear incident" or series of "nuclear incidents" under the Price-Anderson Act.

67. Plaintiffs further assert that Defendants' reckless, negligent and grossly negligent releases of hazardous, toxic, and radioactive waste materials have exposed Plaintiffs to highly dangerous materials.  Plaintiffs have suffered bodily injury, sickness, and disease as a direct and proximate result of their exposures.  Plaintiffs' causes of action therefore assert legal liability based upon a "nuclear incident," or series of such incidents, and is consequently a "public liability action" within the terms of the Price-Anderson Act.  42 U.S.C. §§ 2014(w), (hh).

68. The Price-Anderson Act further provides that in "public liability actions" arising under the Act, the law of the state in which the "nuclear incident" occurred shall provide the substantive rules of decision unless such law is inconsistent with the Act.

69. The causes of action enumerated below exist by virtue of the laws of the state of Missouri, in which the "nuclear incident" occurred, and are therefore properly before this Court as both federal causes of action arising under the Price-Anderson Act and as state law claims ancillary and pendant to the federal claims.

### COUNT TWO:  NEGLIGENCE

70. Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully and completely herein.

71. Defendants owed to Plaintiffs a duty of due care which could only be satisfied by the legal, safe, and proper processing, handling, storage, and/or disposal of the radioactive, toxic and hazardous substances in Defendants' possession.  Defendants had a duty to prevent the discharge or release of such substances that might harm Plaintiffs.  Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to radioactive, toxic and hazardous substances, and to warn or notify Plaintiffs of the fact that discharges or releases of these substances had occurred and were likely to occur in the future.

72. Further, Defendants had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

73. Defendants breached these duties by their reckless, negligent and grossly negligent processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials at the St. Louis FUSRAP Sites.  Such conduct was in utter non-compliance with applicable federal, state and local laws, regulations, and guidelines.  Defendants' reckless,

negligent, grossly negligent, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities surrounding the St. Louis FUSRAP Sites, including but not limited to Berkley, Hazelwood, and Florissant, Missouri.  These actual and continued releases have subjected Plaintiffs to an unreasonable risk of harm, and to actual injuries to their persons.  Defendants also failed to warn Plaintiffs of the actual and threatened releases of such hazardous, toxic, and radioactive substances and of the reasonably foreseeable effects of such releases, an omission that was reckless, negligent and grossly negligent.  Finally, Defendants failed to act to prevent their releases from harming Plaintiffs.

74. Defendants knew about the hazards associated with nuclear operations.  The legislative history of the Price-Anderson Act, which was passed with the active participation of private companies involved in the nuclear power industry, is rife with references to the extreme consequences that could be expected in the event of a nuclear incident.  Indeed, the gravity of such consequences was a major contributing factor to the passage of the Price-Anderson Act.  These Defendants knew or should have known that their generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic and hazardous substances in connection with their operations at the St. Louis FUSRAP Sites would result in actual injuries and increased risks to the persons, property and economic interests of the public without taking proper safety precautions.

75. Defendants' negligence was a direct and proximate cause of Plaintiffs' injuries causing both actual present harm and creating an increased risk of harm to their persons.  Plaintiffs are entitled to recover damages for such injuries.

76. All injuries and damages to Plaintiffs are substantial.

## COUNT THREE:  NEGLIGENCE PER SE

77. Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully and completely herein.

78. Plaintiffs contend that throughout their history, Defendants' conduct in processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials at St. Louis FUSRAP Sites was not in compliance with applicable federal, state and local laws and regulations promulgated thereunder.  Applicable provisions include, but are not limited to, the Atomic Energy Act, 42 U.S.C. § 2011 *et seq*.; regulations issued thereunder in 10 C.F.R. Parts 20, 30, 40, 70, specifically including but not limited to 10 C.F.R. 20.103(a); 10 C.F.R. 20.106(b) and (g); 10 C.F.R. 20.201(b); 10 C.F.R.  20.203(d); 10 C.F.R. 20.206(a); 10 C.F.R. 20.401(b); 10 C.F.R. 20.405(a), (b); 10 C.F.R. 407(b)(1), (2); 10 C.F.R. 30.3, and 10 C.F.R. 70.24; licenses issued thereunder, including but not limited to license SNM-124; the Price-Anderson Act, 42 U.S.C. § 2210 *et. seq*.; regulations issued thereunder; the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601, 9603, and 9611(g); regulations issued thereunder; the Toxic Substances and Control Act (TSCA), 15 U.S.C. §§ 2601, 2607(e); regulations issued thereunder; the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901, 6924(d), and 6925; regulations issued thereunder; the Emergency Planning and Community Right to Know Act (EPCRTKA), 42 U.S.C. §§ 11001, 11023; regulations issued thereunder; and applicable Illinois air and water quality protection and waste disposal laws.

79. These violations of applicable state, federal, and local laws, regulations, and guidelines were a direct and proximate cause of injuries to Plaintiffs.  The increased risk of harm and the actual present harm to their persons is precisely the type of injury these laws were designed to prevent.  Violation of these statutes thereby constitutes negligence per se.

80. Defendants' negligence per se was a direct and proximate cause of Plaintiffs' injuries causing both actual present harm and creating an increased risk of harm to their persons. Plaintiffs are entitled to recover damages for such injuries.

## COUNT FOUR:  ABSOLUTE OR STRICT LIABILITY

81. Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully and completely herein.

82. Defendants' conduct in the processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials poses significant risk of harm to persons living and working in the vicinity of the operation.  The consequences of nuclear accidents or incidents to health, property and the environment are extremely dire, and can be measured in millions, if not billions of dollars.  Nor is it possible to eliminate all of the risk by taking reasonable precautions. Finally, the processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials has never been a matter of common usage; indeed, private operators historically were not permitted to engage in such activities at all.  The conduct of Defendants' activities at the St. Louis FUSRAP Sites clearly constituted abnormally dangerous activities.

83. In addition, with the knowledge of the environmental and health hazards associated with the processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials, Defendants chose to conduct their activities near residential communities such as Berkley, Hazelwood, and Florissant, Missouri.  Although Plaintiffs maintain that Defendants' activities were abnormally dangerous per se, the location of such activities in well-populated areas such as St. Louis, Missouri and its surrounding area would independently have rendered them abnormally dangerous.

84. As a direct and proximate result of Defendants' processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials at the St. Louis FUSRAP Sites,

there have been releases of such substances into the environment, thereby injuring Plaintiffs, whose injuries include actual present harm and increased risks of harm to their persons. These injuries constitute the type of harm the possibility of which made Defendants' activities abnormally dangerous.

85. Defendants are therefore strictly liable to Plaintiff for all damages which have resulted and which will continue to result from the collection, handling, processing, storage and disposal of radioactive, toxic and hazardous substances at the St. Louis FUSRAP Sites.

86. Defendants' conduct was a direct and proximate cause of Plaintiffs' injuries, causing both actual present harm and creating an increased risk of harm to their persons.  Plaintiffs are entitled to recover damages for such injuries.

## COUNT FIVE:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

87. Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully and completely herein.

88. As set forth more fully above, Defendants' conduct in operating the St. Louis FUSRAP Sites was extreme and outrageous.  Moreover, Defendants' conduct was willful and intentional and in total disregard of the consequences to Plaintiff.  Defendants' conduct was, in fact, so extreme and outrageous that it exceeded all bounds of decency and must be regarded as atrocious and intolerable in a civilized society.

89. Defendants' conduct did actually and proximately cause Plaintiffs mental anguish, severe emotional distress, and serious mental injury, as well as other substantial injury, damages and loss.

## COUNT SIX:  RECKLESS INFLICTION OF EMOTIONAL DISTRESS

90. Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully and completely herein.

91. As set forth more fully above, Defendants' conduct in operating the St. Louis FUSRAP Sites was willful, intentional, and reckless.  Moreover, Defendants' conduct was in deliberate disregard of the high degree of probability that Plaintiffs would suffer mental anguish, severe emotional distress, and serious mental injury, as well as other substantial injury, damage, and loss.

92. Defendants' conduct did actually and proximately cause Plaintiffs mental anguish, severe emotional distress, and serious mental injury, as well as other substantial injury, damages and loss.

## COUNT SEVEN:  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

93. Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully and completely herein.

94. As set forth more fully above, Defendants' conduct in operating the St. Louis FUSRAP Sites was negligent and involved numerous breaches of the standard of care.

95. It was reasonably foreseeable that these breaches of the standard of care would cause Plaintiffs mental anguish, severe emotional distress, and serious mental injury, as well as other substantial injury, damages, and loss.

96. Defendants' conduct did actually and proximately cause Plaintiffs mental anguish, severe emotional distress, and serious mental injury, as well as other substantial injury, damages and loss.

## COUNT EIGHT:  MEDICAL MONITORING

97. Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully and completely herein.

98. At all times material hereto, Defendants owed a duty to Plaintiff to ensure the adequate processing, transportation, storage, handling, and/or disposal of hazardous, toxic, and radioactive materials in close proximity to residential neighborhoods in and around St. Louis, Missouri.

99. Plaintiffs assert equitable claims under state law for medical monitoring for Defendants reckless, negligent and grossly negligent operations, including but not limited to the processing, transportation, storage, handling, and/or disposal of hazardous, toxic, and radioactive materials in close proximity to residential neighborhoods in and around St. Louis, Missouri.

100.  The significantly increased risks associated with exposure to these hazardous, toxic, and radioactive materials make periodic diagnostic medical examinations reasonable and necessary.

101.  Easily administered, cost effective tests are in existence, such that an available medical monitoring program is reasonable and necessary for continued monitoring of diagnosed conditions as well as for early detection of yet to be diagnosed injuries.

102.  The reasonableness and necessity of a medical monitoring program is supported by contemporary scientific principles, medical literature, and expert opinion.

103.  As a direct and proximate result of Defendants' reckless, negligent and grossly negligent operations, as set forth herein, Plaintiffs have been exposed to potentially lethal doses of hazardous, toxic, and radioactive materials and, as a result, suffer a significantly increased risk of death, further surgery, or other serious health complication.  This increased risk makes periodic diagnostic and medical examinations reasonable and necessary. Easily administered, cost

effective monitoring and testing procedures exist which make the early detection and treatment of such injuries or disease possible and beneficial.

## X.

## DAMAGES

104. As a direct and proximate result of Defendants' tortious conduct as alleged above, Plaintiffs have been injured by exposure to toxic and radioactive substances.  Plaintiff has been damaged in the following particular ways and seeks to recover therefore:

A.  Plaintiffs have suffered and will continue to suffer great physical pain and mental anguish, and will continue to suffer great pain and anguish throughout their lifetimes;

B.  Plaintiffs have incurred hospital, medical, pharmaceutical, and other expenses, and will continue to incur such expenses in the future due to the permanent nature of their injuries resulting from exposure to toxic, hazardous, and radioactive substances, from which injuries they have suffered,  now suffer and/or will continue to suffer in the future;

C.  Plaintiffs have suffered,  now suffer and/or will continue to suffer physical impairment due to their injuries resulting from exposure to toxic, hazardous, and radioactive substances;

D.  Plaintiffs suffer a permanent partial disability at this time and may become permanently or totally disabled in the future due to the progressive character of injuries resulting from exposure to toxic, hazardous, and radioactive substances;

E.  Plaintiffs require or will require domestic help and nursing care due to their disabilities and has been or will be required to pay for such domestic help and nursing services;

F. Prior to their onset of his symptoms, Plaintiffs were extremely active and participated in numerous hobbies and activities, and as a result of his injuries, Plaintiff has been and will be prevented from engaging in said activities, in which his participation was normal prior to developing symptoms and injuries resulting from exposure to toxic, hazardous, and radioactive substances.  Plaintiff has been and will otherwise be prevented from participating in and enjoying the benefits of a full and complete life;

105. Because Defendants' conduct was intentional, malicious, grossly negligent and reckless, Plaintiffs seek punitive damages; and

A. all other compensatory and punitive damages that may be proven at the trial of this action.

106. The conduct of Defendants, as alleged herein, was a direct, proximate and producing cause of the damages resulting from Plaintiff's injuries, and of the following general and special damages that Plaintiff has sustained:

A. Damages for reasonable and necessary medical expenses incurred by Plaintiffs;

B. Damages for Plaintiffs' lost earnings and net accumulations;

C. Damages for the loss of care, maintenance, services, support, advice, and counsel each Plaintiff's family members received from each Plaintiff prior to last illness;

D. Damages for pain and suffering;

E. Damages for emotional distress;

F. Punitive damages;

G. Costs; and

H. Reasonable attorneys' fees.

## XI.

### PRAYER FOR RELIEF

107. WHEREFORE, PREMISES CONSIDERED, Plaintiffs demand judgment against

Defendants, and each of them, jointly and severally, for:

A.  General damages;

B.  Special damages;

C.  Punitive and exemplary damages;

D.  Reasonable attorneys' fees and costs expended herein;

E.  Prejudgment interest from the date of Plaintiffs' exposure to toxic, hazardous, or
    radioactive substances released by Defendants; and

F.  Post judgment interest on the judgment at the rate allowed by law, and for
    injunctive relief.

Dated: February 28, 2012

                                    Respectfully submitted,

                                    _/s/ Eric J. Carlson_____
                                    Eric J. Carlson, #47423MO
                                    Christopher W. Byron, #47989MO
                                    Byron Carlson Petri & Kalb, LLC
                                    411 St. Louis Street
                                    Edwardsville, Illinois 62025
                                    Telephone (618) 655-0600
                                    Facsimile (618) 655-4004

Co-Counsel:

Marc J. Bern
Kevin J. Lawner
Napoli Bern Ripka Shkolnik &Assoc., LLP
The Empire State Building
350 Fifth Avenue, Suite 7413
New York, NY 10118
212-267-3700